**RECEIVED**

JUN 1 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEVEN IVEY, )
)
    Plaintiff, )
) Civil Action No. 07-0480 (EGS)
V. )
)
US Dept. of the Treasury, et al, )
)
    Defendant. )

### PLAINTIFF'S REPLY TO MOTION TO DISMISS

1.    The plaintiff, Ivey, with the following is responding to the US Treasury, defendant's, Motion to Dismiss, May 24, 2007. This motion is premature in that the defendant has not responded to the plaintiff's complaint with answers. Should the defendant claim that such as been filed the plaintiff has not receive any such reply answers. This leaves no clear date as to providing to the Court a Preliminary Report.

2.    Because the plaintiff has filed with DC District similar FIOA/Privacy Act civil actions it has been established between the plaintiff and defendant that proper jurisdiction resides in DC District. To this the plaintiff notes that the three districts suitable for a citizen to file FIOA/Privacy Act civil action is (1) DC; (2)where the defendant's principle

1

office resides, or (3) where the plaintiff resides. Because of the familiarity of the subject matter it is more efficient for the review of the plaintiff's claims to be in the DC District as filed. Therefore, Rule 12(b)(1) was and has been met, otherwise, if not it would produce a conflict within the Court.

3.	The defendant's argument for a defense of sovereign immunity is moot. It is not of a necessity for the Court to consider this as a means of dismissal. Should the Court find that it is relative for consideration of dismissal, the Court would have to resolve, (1) the conflict between the US Treasury and the NTEU acting as partners against the plaintiff, (2) the criminal activities involved; and (3) the conflicts it would create with other case and other Districts/Circuits. Before the Court could consider these issues, the defendant would first have to show with such sufficiency that it is entitled to dismissal by supplying resolve of the 3 issues. The defendant's motion offers no such explanation.

4.	For the defendant's arguments as to the statute of limitations under the Privacy Act as two years, it should be noted that the recent DC District decision, March 27, 2007, in <u>Ivey v. NTEU</u> , 05-1147, the Court accepted the NTEU's denial, exhibit S, of any connection with exhibit A in order to dismiss the plaintiff's claims surrounding exhibit A.

This decision, further, affects exhibits T & U, similarly, because Robert Hall has committed perjury from the inconsistency with exhibit A and the NTEU.

5.      Concentrating more to the contents of exhibit A it should be noted that this alleged call by the NTEU occurred while Ivey was in NC no longer an employee of the Treasury, the end of March 2001. To date neither the Treasury nor the NTEU have responded to request from the plaintiff for verification or support from Lisa Porter or Angela Strong.

**Lines 1 & 2**: This represents hearsay on the part of Lisa Porter and Robert Hall which amounts to gossip in order to discredit Ivey.

**Line 3** : The plaintiff did not make such a call to NTEU, therefore, no conversation with Angela Strong. If there was such a call it does not explain how Angela Strong would have identified the caller as the plaintiff from that of a "crank" caller.

**Line 4** : During the meeting of exhibit T in which Doug Van Buren was improperly present, the plaintiff told him that the IRS/Treasury was trying to terminate him because of reporting the prohibited practices; EEOC violations; and that the plaintiff had done so to the various agencies in DC. With this in mind, why would the plaintiff call the NTEU to say he was terminated for his beliefs ? This, also, occurred during a time when the plaintiff was contacting the EEOC and OSC . The term "beliefs" is strange because it suggest a more religious reasoning of views. There are such things as improbable character traits; for the plaintiff this would apply with the term "beliefs", equally so for talking to what would be a stranger about such "beliefs."

**Lines 5 & 6** : This question and statement for Ivey are highly usual because it evokes a role of Angela Strong , though a stranger to Ivey, a more personal familiar role to Ivey. It should be noted that Ivey had come to the

3

Case 1:07-cv-00480-EGS   Document 8   Filed 06/18/2007   Page 4 of 10

understanding that the NTEU was ineffective in resolving complaints before Ivey was terminated and understood that Doug Van Buren was not suppose to be present as with attachment #2 meeting where he was coercing Ivey to sign away his rights. Consequently, this lends to much credibility to the NTEU in that approximately one month after Ivey's termination, he would have trusted any contact with the NTEU or think that the NTEU would do anything to assist him. All this in light of the accusation of some personal conversation about "beliefs."

The use of the racial and sexual language was intended by the US Treasury to discredit the plaintiff in order to intimidate, retaliate, and give support to the Treasury in defense of the plaintiff's claims against the US Treasury. The idea of not taking orders was to provoke a defiant character of the plaintiff to discredit him and negate the fact that the plaintiff refused to participate in changing taxpayers' documents, department violations, and EEO violations.

**Lines 6 & 7:** The plaintiff would not think that the union president would be sitting around ready to take phone call or more particularly to meet. The plaintiff is sure these would have to be arranged for anyone. These may be possible events but not probable as a rule. As stated above the plaintiff would not have contacted the NTEU since by this date the NTEU had established a behavior mistrust for the plaintiff.

**Line 8 :** This statement signifies that the document is basically hearsay which under **FR of Evidence § 802** means that it is not admissible in making decisions against the plaintiff.

6.      There are many problems that are generated by exhibit A. Though the document has been cited as having occurred at the end of March 2001 it has been used by the Treasury in administrative and judicial reviews of the plaintiff's claims of MSPB whistle-blowing and EEOC Title VII employment discrimination and harassment. Because of this extensive

4

use it has resulted in damage to the plaintiff on a rolling basis until the present date. The Treasury has refused to resolve the validity or provide verification for it's inclusion in any proceedings. Depending of where the determination of blame falls there are charges subornation of perjury at the very least against the responsible person of the Treasury.

7.      The plaintiff has denied any involvement with exhibit A and supplied his phone record during the time in question, attached as exhibit V. From this phone statement there can be seen that no calls were made for the days that NTEU/ Treasury claims. The calls to Acworth, GA, were to a co-worker, Susan Karimi. The plaintiff and Susan Karimi exchanged phone numbers during employment at the center. It was normal to call her because the plaintiff and Susan did call each other over the weekends during employment and after. In March of 2001, the Thursday and Friday as referenced in attachment #4, line 3, would have been the 29th and 30th. From the plaintiff's phone bill there are no calls made on the 29th and of the calls on the 30th none were to the NTEU. Should the Treasury/NTEU state that the alleged "racial" call occurred from another phone then it should provide such proof. It should start with the records at the IRS center. This conclusion raises the fact that since Angela Strong made the accusation

5

against the plaintiff the burden of proof rest with her and the NTEU.

8. Because Angela Strong reported that the plaintiff made this alleged call the initial questions start with her. There can be, thus, two scenarios for Angela Strong (1) that she denies the incident ( the NTEU has with exhibit S denied involvement with the call) and (2) she can state that she confirms that the plaintiff called her at the NTEU as stated.

9. For the first (1) scenario the burden of proof would then shift to Robert Hall for questioning. In doing so it would initially make Robert Hall and the Treasury responsible for the production of this false document creating violations of perjury and forging evidence.

10. It is reasonable to conclude that Robert Hall and the Treasury would deny the any wrong doing with exhibit A, so the burden of proof would then fall to Lisa Porter. However, Robert Hall and the Treasury would be guilty at the minimum of perpetuating damaging unsubstantiated negative claims against the plaintiff during an investigation for violations under MSPB and the EEOC, exhibit A was not properly verified in order to protect the plaintiff. This is an act of defrauding official reviews.

11. The minimal fault of the Treasury is that it perpetuated unverified information against the plaintiff that has resulted in damages to

the plaintiff that continues till the present date, under the Privacy Act. The exhibits are demonstrations of these violations with the statute of limitation in March 2009.

12.     Res judicata does not apply to the present case, as opposed to any previous claims under the Privacy Act, because perjury, forging of evidence, and subornation of perjury regarding the exhibits herein was not raised previously.  If the Court should decided that it did, then it would have to explain why it would have done so with unresolved credibility issues and fraud.  It should be noted that since there have been more criminal acts raised that caution to prosecutors be advised.  From the above the defendant has not given due consideration to judicial efficiency so as to avoid inconsistent results.

## CONCLUSION

In order for a defendant to be granted a dismissal it has to show that it is proper without any, even remote chance, that the plaintiff is in entitled to relief. From the above the defendant has not resolved many issues nor when compared to any previous Privacy Act claims has resolved issues of perjury, forged evidence, and subornation of perjury, which involves 18 USCS § 1001. Therefore, because there are unresolved

FIOA/Privacy Act issues, the Court should deny defendant's Motion of Dismissal.

8

## Certification of Service

The attached document was sent by certified mail to:

Office of the Clerk
US District Court for DC
333 Constitution Ave, N.W.
Washington, DC, 20001

And by regular mail to:

Jason Zarin / Brittney Campbell
US Dept. of Justice
PO Box 227
Ben Franklin Station
Washington, DC, 20044


_June 16, '07_
Date

Steven Ivey
Plaintiff

# Your AT&T Statement

April 29, 2001



#BWNCJFM

STEVE IVEY

Customer # 7810███████4804
Page 1 of 4

Customer Service:   1 800 224-5610
Call Collect:       706 644-0524
Text Phone (TTY):   1 800 855-2880



### Summary of charges

| | |
|---|---:|
| Previous balance | - 5.60 |
| Payments | 0.00 |
| **Credit balance as of Apr 29** | **- $5.60** |
| AT&T One Rate®College Plan | 20.60 |
| Other charges and credits | 5.40 |
| Taxes and surcharges | 0.87 |
| **Current charges** | **$26.87** |
| **Total amount due** | **$21.27** |
| Date due | May 27, 2001 |

*Have you heard*
There's more to your AT&T bill than just charges! You'll also find helpful information on services, products and calling plans.
Continued ▶

Continues on back



### Detach and return with payment

Please write your customer number on your check or money order made payable to AT&T. Do not send cash. Do not staple this portion to your payment. Thank you.

| | |
|---|---:|
| Total amount due | $21.27 |
| Date due | May 27, 2001 |
| Amount enclosed: | $ |

AT&T DBC
PO BOX 8226
AURORA IL 60572-8226

STEVE IVEY
April 29, 2001

Customer # 7810 ███████ 4804

☐ Moving? Check the box and print new address on back.

*EXHIBIT V*

**AT&T**

Customer Service: 1 800 224-5610
Call Collect: 706 644-0524
Text Phone (TTY): 1 800 855-2880

April 29, 2001
Customer # 7810 ▮▮▮▮ 4804
Page 3 of 4

## AT&T One Rate® College Plan

| Description | Amount |
|---|---|
| Calling Card Calls | 20.60 |
| **Total AT&T One Rate (R) College Plan** | **20.60** |

| # | Date | Time | Where | Number called | Type | Rate | Min | Amount |
|---|---|---|---|---|---|---|---|---|
| 1. | Mar 21 | 12:38pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 1 | 0.20 |
| 2. | Mar 21 | 12:39pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 1 | 0.20 |
| 3. | Mar 21 | 12:40pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 2 | 0.40 |
| 4. | Mar 21 | 12:43pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 1 | 0.20 |
| 5. | Mar 21 | 02:13pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 1 | 0.20 |
| 6. | Mar 26 | 04:15pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 1 | 0.20 |
| 7. | Mar 26 | 04:29pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 4 | 0.80 |
| 8. | Mar 26 | 04:37pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 1 | 0.20 |
| 9. | Mar 30 | 03:11pm | CHESAPEAKE VA 757▮▮▮ Called From ▮▮▮ VA 757▮▮▮ | | Station | N/Wknd | 1 | 0.20 |
| 10. | Mar 30 | 03:12pm | CHESAPEAKE VA 757▮▮▮ Called From ▮▮▮ VA 757▮▮▮ | | Station | N/Wknd | 1 | 0.20 |
| 11. | Mar 30 | 03:18pm | PORTSMOUTH VA 757▮▮▮ Called From ▮▮▮ VA 757▮▮▮ | | Station | N/Wknd | 1 | 0.20 |
| 12. | Mar 31 | 04:40pm | ACWORTH GA 770 966-▮▮▮ Called From ▮▮▮ VA 757▮▮▮ | | Station | N/Wknd | 1 | 0.20 |
| 13. | Mar 31 | 04:41pm | ACWORTH GA 770 966-▮▮▮ Called From ▮▮▮ VA 757▮▮▮ | | Station | N/Wknd | 40 | 8.00 |
| 14. | Apr 03 | 02:32pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 6 | 1.20 |
| 15. | Apr 03 | 03:28pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 2 | 0.40 |
| 16. | Apr 03 | 03:31pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 1 | 0.20 |
| 17. | Apr 03 | 03:33pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 1 | 0.20 |
| 18. | Apr 03 | 03:34pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 2 | 0.40 |
| 19. | Apr 03 | 03:36pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 1 | 0.20 |
| 20. | Apr 03 | 04:35pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 20 | 4.00 |
| 21. | Apr 04 | 08:35pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 8 | 1.60 |
| 22. | Apr 04 | 08:43pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 4 | 0.80 |
| 23. | Apr 19 | 09:04pm | ▮▮▮ | ▮▮▮ | Station | N/Wknd | 2 | 0.40 |

Continues on back